

**FILED**

AO 91 (REV.5/85) Criminal Complaint

MAY – 3 2012

AUSA Jennie Levin    (312) 353-5372

UNITED STATES DISTRICT COURT
THOMAS G. BRUTON
NORTHERN DISTRICT OF ILLINOIS
CLERK, U.S. DISTRICT COURT
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ZENON GRZEGORCZYK

**CRIMINAL COMPLAINT**

MAGISTRATE JUDGE GILBERT

CASE NUMBER: 12CR 320

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about April 27, 2012, at Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, ZENON GRZEGORCZYK defendant herein:

> knowingly used a facility of interstate commerce, namely a 1999 Honda Accord automobile, bearing Illinois license plate K598027, with intent that a murder be committed in violation of the laws of the State of Illinois (720 ILCS 5/9-1), as consideration for a promise or agreement to pay anything of pecuniary value;

in violation of Title 18, United States Code, Section 1958(a). I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
ERIC DORNBUSCH
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to before me and subscribed in my presence,

May 3, 2012                                    at        Chicago, Illinois
Date                                                      City and State

JEFFREY T. GILBERT, U.S. Magistrate Judge

Name & Title of Judicial Officer                        Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                       )     ss
NORTHERN DISTRICT OF ILLINOIS  )

## AFFIDAVIT

I, ERIC DORNBUSCH, being duly sworn, state as follows:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed for approximately two and a half years. Prior to working for the ATF, I was employed as an Air Marshal with the Department of Homeland Security, Federal Air Marshal Service for approximately for three years. My current responsibilities include the investigation of crimes that involve, among other things, the violations of federal firearms and explosives laws.

2.    This affidavit is made for the limited purpose of establishing probable cause in support of:

a.    A Criminal Complaint alleging that ZENON GRZEGORCZYK used a facility of interstate commerce with intent that a murder be committed in violation of the laws of the State of Illinois (720 ILCS 5/9-1), in violation of Title 18, United States Code, Section 1958(a); and

b.    A Search Warrant for the single family home located at 2426 Rita Street, Des Plaines, Illinois, (the "**Subject Premises**") described further in Attachment A, for evidence, instrumentalities, and fruits, described further in Attachment B.

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging GRZEGORCZYK with murder for hire and a search warrant for the **Subject Premises**, I have not included each and every fact known to me concerning this investigation.

4.     This affidavit is based on my participation in this investigation, including conversations with other law enforcement officers, a confidential informant, and my review of documents and recorded conversations. References to statements from recorded conversations do not include all statements or topics covered during the course of the recorded conversations, and are not taken from a final transcript.

5.     According to a Cooperating Individual ("CI")[1], in or around late February or early March 2012, Individual A approached CI and asked CI if he/she could help GRZEGORCZYK ship several "items" to Poland. According to the CI, during this conversation, Individual A provided (847) 682-9324 ("GRZEGORCZYK Phone 1") as a contact number for GRZEGORCZYK. According to CI, Individual A told CI that Individual A had provided CI's cellular telephone number to GRZEGORCZYK.

6.     According to CI, a short time later, CI received a call on his cellular phone from GRZEGORCZYK Phone 1. This conversation was not recorded. According to CI, during this phone conversation, GRZEGORCZYK[2] asked CI to meet him at McDonalds restaurant located near River Road and Irving Park Road in Chicago, Illinois. According to CI, he/she agreed to meet GRZEGORCZYK at the McDonalds. According to CI, shortly thereafter CI met GRZEGORCZYK[3]

_____

[1]  According to law enforcement, CI has no criminal history. CI is being paid for his/her cooperation with ATF. To date, CI has received no more than approximately $300 for his/her participation in this investigation.

[2]  According to CI, the male caller identified himself as GRZEGORCZYK.

[3]  According to CI, the white male who CI met at McDonalds introduced himself as GRZEGORCZYK. Also, following this meeting, CI was shown a photograph of GRZEGORCZYK and identified the white male that he/she met at McDonalds as GRZEGORCZYK.

at McDonalds located at River Road and Irving Park Road. This meeting was not recorded. According to CI, during meeting, GRZEGORCZYK told CI that he wanted to ship several "items," which he had in his possession, to Poland – with no questions asked. CI advised that GRZEGORCZYK informed CI that the "items" were guns and that GRZEGORCZYK wanted to ship the guns to his "group" in Poland. According to CI, he/she told GRZEGORCZYK that he/she could ship the guns for GRZEGORCZYK. The CI advised that he/she and GRZEGORCZYK agreed to meet at a later date to discuss the details of the gun transaction.

7.     According to CI, approximately one week later GRZEGORCZYK called CI from GRZEGORCZYK Phone 1. This conversation was not recorded. According to CI, GRZEGORCZYK asked CI to meet him at a Jewel supermarket located in the area of Central and Lawrence in Chicago, Illinois. According to the CI, the CI agreed to meet GRZEGORCZYK at the Jewel.

8.     A short while later, the CI advised that he observed GRZEGORCZYK arrive at the Jewel in a white Mercedes vehicle bearing Illinois license plate A963205 (GRZEGORCZYK Mercedes).[4] During this meeting, CI advised that GRZEGORCZYK asked CI if CI was ready ship the guns for GRZEGORCZYK. According to the CI, GRZEGORCZYK then retrieved three handguns from the rear of the GRZEGORCZYK Mercedes. According to CI, GRZEGORCZYK told CI that GRZEGORCZYK wanted approximately 10 more guns for his "group," including pistols and assault rifles. According to CI, CI told GRZEGORCZYK that if GRZEGORCZYK had money,

---

[4]According to the Illinois Secretary of State records, Illinois license plate A963205 is registered to a 2010 Mercedes-Benz sports utility vehicle and registered to Daimler Trust LSR, DMZ Properties LSE located at 2309 N. 76th Court in Elmwood Park, Illinois.

3

CI knew someone who could get GRZEGORCZYK the guns he was looking for. According to CI, GRZEGORCZYK responded that money would not be a problem. According to CI, at the conclusion of their meeting, GRZEGORCZYK put the three firearms he had shown CI back in the GRZEGORCZYK Mercedes and departed in the GRZEGORCZYK Mercedes.

9.      On or about April 12, 2012, at approximately 3:44 p.m., acting at the direction of law enforcement and in their presence, CI made a consensually recorded and monitored telephone call to GRZEGORCZYK at GRZEGORCZYK Phone 1. Law enforcement observed CI dial GRZEGORCZYK Phone 1. Based on law enforcement's review of the recorded call, during the call GRZEGORCZYK and the CI agreed to meet at 11:30 a.m. the following day at an office building located in the in the 6100 block of Milwaukee Avenue in Chicago so CI could introduce GRZEGORCZYK to the CI's gun supplier.[5]

10.      The following day, April 13, 2012, law enforcement set up surveillance in the area of the 6100 block of Milwaukee Avenue, where GRZEGORCZYK agreed to meet CI and CI's gun suppliers ("UC1" and "UC2"), who unbeknownst to GRZEGORCZYK were undercover law

_____

[5] To the extent I refer to the content of consensually recorded conversations in this Affidavit, the content of the conversations is based on law enforcement's review of the recordings and my discussions with CI, UC1, and UC2, who were participants in these conversations. The excerpts set forth in this Affidavit are based on draft transcripts. Some of these recordings occurred in the Polish language. For conversations that occurred in the Polish language, the excerpts set forth in this affidavit are based on draft English translations of the conversations, which were translated by a Polish speaking ATF Task Force Officer and/or other Polish speaking law enforcement officers. The bracketed phrases reflect my understanding of the meaning of a particular statement, which is based in part upon information received from CI and UC1, and UC2 as well as from my own knowledge drawn from my training and experience and my knowledge of the investigation. Some of these summaries do not include references to all the topics covered during the course of the conversations. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned.

enforcement officers. Shortly thereafter, CI, UC1, and UC2 departed to the meet location in an undercover vehicle ("UCV 1"). Before arriving at the meet location, agents searched CI for the presence of money and contraband, including controlled substances and firearms, with negative results. Agents also equipped UC1 with an audio and video recording device, as well as a audio transmitter.

11.     At approximately 12:11 p.m., law enforcement observed the UCV 1 arrive and park in the area of the 6100 block of Milwaukee Avenue. Minutes later, law enforcement observed CI, UC1, and UC2 exit the UCV 1 and enter the office building. Shortly thereafter, according to UC1 and UC2, and as heard on the audio recording, GRZEGORCZYK arrived at and entered the office building as well.[6]

12.     According to UC1 and UC2, and as heard on the audio recording, while inside the office building, GRZEGORCZYK, UC1, UC2, and CI discussed selling GRZEGORCZYK firearms, and shipping the firearms to Poland. According to UC1 and UC2, and as heard on the audio recording, at one point during the meeting, GRZEGORCZYK began complaining about women and stated, "women, you can't live with them and you can't shoot them." UC1 responded, "you can't shoot them and get caught," and GRZEGORCZYK stated, "There you go. That's what I want to talk about – you got somebody?" [GRZEGORCZYK wants to know if UC1 knows a hitman to shoot someone for GRZEGORCZYK.] UC1 responded, "you just want her scared?" and GRZEGORCZYK replied, "my friend got 35 years just for talking about it." According to UC1 and UC2 and as heard on the audio recording, GRZEGORCZYK was concerned that the office building

---

[6] UC1 and UC2 previously viewed a photograph of GRZEGORCZYK and identified GRZEGORCZYK as the individual who met them at the office building.

may be bugged so GRZEGORCZYK and UC1 agreed to continue their conversation about this new proposal outside.

13.     According to UC1, and as seen on the video recording, UC1, UC2, CI, and GRZEGORCZYK exited the office building and UC1, UC2, and GRZEGORCZYK continued their conversation outside near an alleyway on the street. According to UC1, and based on law enforcement's review of the recording, during the conversation GRZEGORCZYK stated, "I want to do it [shoot the individual] myself, but I have to have an alibi." UC1 asked, "Do you want her dead or do you want her scared?" and GRZEGORCZYK replied, " I can't say that" and laughed. According to UC1, GRZEGORCZYK then patted UC1's chest and stomach as if he was looking for a hidden recording device. In an attempt to make his previous question less direct, UCA1 asked, "Is it serious or not serious?" and GRZEGORCZYK replied, "Serious." [GRZEGORCZYK wants the woman killed.]    In response, UC1 asked GRZEGORCZYK what this woman had done to GRZEGORCZYK, and GRZEGORCZYK replied, "Two fuckin' bitches – that's why I lose my son . . . . I'm not going to tell you shit right now, I figure out what's supposed to be done. I know everything right here [GRZEGORCZYK pointed to his head]. I'm gonna tell you when we talk serious." UC1 agreed to murder these woman for GRZEGORCZYK in exchange for $20,000, and GRZEGORCZYK laughed and responded, "I can do it for $5,000 . . . each. Those motherfuckers [associates of GRZEGORCZYK] want to do it for two [murder the women for $2,000], but I don't trust them that much."

14.     According to UC1, GRZEGORCZYK was very paranoid that someone would overhear their conversation, so, as heard on the audio recording, UC1 suggested that he/she and GRZEGORCZYK refer to the murders as "the drywall job," and GRZEGORCZYK agreed.

GRZEGORCZYK then stated, "Telling the truth, I don't trust you guys [UC1 and UC2] right now – that's why I measure my words." UC1 responded that he understood GRZEGORCZYK concerns and asked how GRZEGORCZYK was going to pay UC1 and UC2 to murder the women for GRZEGORCZYK, and GRZEGORCZYK stated, "Part of it, half the price, and he'll [CI] keep the rest." [GRZEGORCZYK would pay UC1 and UC2 half up front and give the rest to the CI to hold until the job was done.] GRZEGORCZYK then stated, "I am thinking it my mistake to talk to you guys right here . . . We can go to Russian [bath house] and talk, no clothes no nothing. In sauna I will tell you everything." GRZEGORCZYK told UC1 and UC2 that he would meet them "whenever you want, it just has to be right place, then I am gonna go and show you everything . . . Everything has to be right. You don't want to get in trouble, I don't want to get in trouble . . . I don't want anyone to screw up." GRZEGORCZYK also stated, "I don't care about my life anymore. What those fuckin' bitches did to my family – that's why we split. Huge money, I was doing well, I was making money not paying – and those fuckin' bitches doing whatever they want with it, and they have to pay the price right now."

15.     According to UC1, and as heard on the audio recording, GRZEGORCZYK and UC1 discussed how GRZEGORCZYK wanted the women killed, and GRZEGORCZYK stated, "I got the way," and held up a lighter and made a poof sound, indicating that he wanted the women to be burned alive. In response, UC1 told GRZEGORCZYK that being burned alive is a horrible way to die, and GRZEGORCZYK responded, "That's why I wanted to do it that way."

16.     According to UC1, and as heard on the audio recording, GRZEGORCZYK told UC1 and UC2 that they could all conduct surveillance on the location where the women socialized. GRZEGORCZYK stated, "I just gonna show you the place where they used to meet – they going for

7

lunches, they go someplace else. You guys [UCA1 and UCA2] have to know what to do." UC1 and UC2 asked GRZEGORCZYK if the women had to be burned alive, and GRZEGORCZYK responded, "Yes. Okay, grab them, go some quiet place – then burn them. Believe me, I want to see those faces, I want to see those faces – but I can't."

17.     According to UC1, and as heard on the audio recording, toward the end of the conversation, GRZEGORCZYK told UC1, "I start trusting you because you can lock me up for what I said. I am talking about if you are cops – you can arrest me for what I said so far." GRZEGORCZYK then began discussing operational security for the murder plot. GRZEGORCZYK instructed UC1 to use a pay phone when UC1 called GRZEGORCZYK, not UC1's cellular phone. In response, UC1 told GRZEGORCZYK that UC1 had a pre-paid phone, and GRZEGORCZYK said, "That's what I got, but making calls to family and stuff. If they [police] find out they gonna figure out. They gonna check out the bill. Guys loose millions because of the telephones."

18.     According to UC1, at the end of the conversation, UC1 handed GRZEGORCZYK a $20 bill, and GRZEGORCZYK wrote down his telephone number, the telephone number for GRZEGORCZYK Phone 1, on the $20 bill. After writing down his phone number, GRZEGORCZYK handed the $20 bill to UC1 and then asked for the $20 bill back. GRZEGORCZYK gave UC1 another $20 bill without writing and one of CI's business cards. GRZEGORCZYK then instructed UC1 to write GRZEGORCZYK's telephone number on the CI's business card. According to UC1, and as heard on the recording, GRZEGORCZYK stated, "You know why I tell you to write it down? Because of my writing." [GRZEGORCZYK did not want his phone number written down in his own handwriting.] GRZEGORCZYK also warned UC1 that their

8

telephone calls should not be "more than twenty seconds." GRZEGORCZYK then stated, "I'm gonna give you [UC1 and UC2] business," and walked away.

19.    On or about April 20, 2012, at approximately 1:43 p.m., acting at the direction of law enforcement and in the presence of law enforcement, CI made a consensually recorded and monitored telephone call to GRZEGORCZYK at GRZEGORCZYK Phone 1. Law enforcement observed CI dial GRZEGORCZYK Phone 1. Based on law enforcement's review of the recorded call, GRZEGORCZYK told the CI that he was still proceeding ahead and would obtain a pre-paid cellular telephone number in the next few days, which the CI should provide to UC1 and UC2.

20.    According to the CI, a few days later GRZEGORCZYK called the CI from GRZEGORCZYK Phone 1 and asked the CI to meet him at the office building located on the 6100 block of Milwaukee Avenue.[7] This conversation was not recorded. According to the CI, the CI agreed and met GRZEGORCZYK at the office building on Milwaukee Avenue at approximately 7:00 p.m. that same night.

21.    The CI advised that when GRZEGORCZYK arrived, the CI was still in his/her vehicle. According to the CI, GRZEGORCZYK was dropped off at the office building by another individual who was driving a dark colored vehicle. According to the CI, after GRZEGORCZYK exited the vehicle he arrived in, GRZEGORCZYK approached the CI's vehicle and entered the front passenger seat. According to the CI, GRZEGORCZYK was carrying a blue duffle bag when he entered the CI's vehicle. According to the CI, GRZEGORCZYK instructed the CI to "drive

_____

[7] This is the same location where the April 13, 2012, meeting with GRZEGORCZYK, UC1, UC2, and CI took place.

9

around."[8] The CI advised that during the drive, GRZEGORCZYK removed a blue steel revolver from his jacket pocket and placed the firearm under his leg. The CI also advised that GRZEGORCZYK removed a black leather case from the blue duffle bag he had with him. According to the CI, GRZEGORCZYK then instructed the CI to write down the telephone number (773) 742-5143 ("GRZEGORCZYK Phone 2"), and told the CI that GRZEGORCZYK Phone 2 was a "safe number" to a pre-paid cellular phone. According to CI, GRZEGORCZYK instructed the CI to provide the number for GRZEGORCZYK Phone 2 to UC1 and UC2. The CI advised that GRZEGORCZYK then opened the black leather case that GRZEGORCZYK had previously removed from his duffle bag. According to the CI, the black leather case contained stacks of cash – mostly in hundred dollar bills. According to CI, GRZEGORCZYK instructed CI to take a picture of the money with the CI's cellular phone so the CI could show the picture to UC1 and UC2. According to CI, GRZEGORCZYK wanted CI to show UC1 and UC2 a picture of the money so UC1 and UC2 would know that GRZEGORCZYK meant business. According to CI, CI advised GRZEGORCZYK that CI could not take a picture of the money because CI did not have a cellular phone with a camera, but that CI would tell UC1 and UC2 about the money.

22.     On or about April 25, 2012, UC1 placed a consensually recorded and monitored telephone call to GRZEGORCZYK at GRZEGORCZYK Phone 2. Based on law enforcement's review of this recording, during the call, GRZEGORCZYK indicated that he wanted to meet with UC1 "as soon as it is possible" at "the same place across the street . . . ." [GRZEGORCZYK wants to meet UC1 at the same place GRZEGORCZYK and UC1 met during a previous meeting.] During the phone conversation, UC1 told GRZEGORCZYK that CI had relayed that GRZEGORCZYK had

_____

[8] This conversation was not recorded.

10

shown CI a large sum of cash, and UC1 now understands that GRZEGORCZYK is serious. GRZEGORCZYK responded, "Okay, okay, we can't talk for long, just call me tomorrow." [GRZEGORCZYK and UC1 cannot have a long telephone conversation for security reasons.]

23.     On or about April 26, 2012, at approximately 2:42 p.m., UC1 placed a consensually recorded and monitored telephone call to GRZEGORCZYK at GRZEGORCZYK Phone 2. According to UC1 and as heard on the recording, during the call, UC1 told GRZEGORCZYK that he/she could meet GRZEGORCZYK the following day at approximately 11:00 a.m. GRZEGORCZYK responded by asking UC1 "are you using a pay phone, did you use a pay phone?" and UC1 responded that he/she was using a "throw-away" phone. GRZEGORCZYK replied, "All right, okay, good . . . eleven tomorrow same place across the street." [GRZEGORCZYK will meet UC1 the following day at the same place GRZEGORCZYK and UC1 met during a previous meeting.]

24.     On or about April 27, 2012, at approximately 11:00 a.m., UC1 and UC2 departed to the McDonalds located at the intersection of Elston Street and Milwaukee Avenue, where GRZEGORCZYK agreed to meet UC1 and UC2, in a 1999 Honda Accord undercover vehicle, bearing Illinois license plate K598027 ("UCV 2"). Before arriving at the meet location, agents equipped UC1 with an audio and video recording device.

25.     Shortly thereafter, UC1 and UC2 arrived at the McDonalds and observed GRZEGORCZYK sitting inside. After exchanging greetings and eating, GRZEGORCZYK, UC1, and UC2 exited the McDonald's restaurant and walked to the UCV2, which was parked nearby. According to UC1 and UC2, GRZEGORCZYK was carrying a black duffle bag. According to UC1 and UC2, after arriving at the 2, GRZEGORCZYK patted UC1's and UC2's chest to ensure that

11

UCA1 or UCA2 were not wearing a "wire" (an electronic recording device). According to UC1 and UC2 and as seen on the video recording, GRZEGORCZYK, UC1 and UC2 enter the UCV 2. Once inside, as seen and heard on the audio and video recording, GRZEGORCZYK removed a red file folder from his duffle bag which contained several 8 ½ x 11 photographs of at least three individuals that GRZEGORCZYK wanted UC1 and UC2 to murder ("Individual B," "Individual C," and "Individual D").[9] While showing UC1 and UC2 the photographs, GRZEGORCZYK stated, "I am paying five a piece [GRZEGORCZYK is willing to pay UC1 and UC2 $5,000 for each person killed]." GRZEGORCZYK also stated, "I think there is going to be four of them [victims] . . . so you are making twenty [$20,000]."

26.     As seen on the video recording, GRZEGORCZYK also showed UC1 and UC2 smaller commercially printed photographs which were identical to the larger printed photographs he had just shown them.[10]     According to UC1 and UC2, and as heard on the audio recording, GRZEGORCZYK stated that he prepared the larger printed photographs from the smaller photographs using GRZEGORCZYK's home computer and scanner.

27.     According to UC1 and UC2, and as heard on the audio recording, GRZEGORCZYK offered to show UC1 and UC2 where his intended murder victims lived. GRZEGORCZYK then directed UC1 to drive the UCV 2 to the neighborhood where GRZEGORCZYK's ex-wife lived, which UC1 did. GRZEGORCZYK identified the address of his ex-wife's residence told UC1 and

---

[9] A review of the photographs reveals that the photographs appear to have been printed on computer paper.

[10] A review of the smaller commercially printed photographs reveal that they appear to be the source of the larger computer generated photographs that GRZEGORCZYK gave to UC1 and UC2.

12

UC2 that they should conduct surveillance of his ex-wife's residence because the intended victims spend time there. GRZEGORCZYK then instructed UC1 to drive to two additional residences, which UC1 did. GRZEGORCZYK identified both residences as residences of his intended victims. GRZEGORCZYK also provided a description, including the license plate number, of Individual B's and Individual C's vehicle ("Victim Vehicle").[11] GRZEGORCZYK told UC1 and UC2 that the victims were scheduled to attend a wedding in early June and that killing the victims right before the wedding would be best. GRZEGORCZYK told UC1 and UC2 that he blamed the victims for his divorce and for losing his son.

28.     According to UC1 and UC2 and as heard on the audio recording, UC1 asked GRZEGORCZYK, "Do we have to burn them [the victims] like you talked about?" and GRZEGORCZYK replied, "Do whatever. Do it [the murder] the safest way so don't get caught . . . but remember burning is the hardest to determine the evidence." GRZEGORCZYK agreed that he would pay UC1 and UC2 $5,000 per victim and stated that the number of victims could change depending on who was present when UC1 and UC2 arrived to kill the victims because UC1 and UC2 could not leave witnesses. In response, UC1 asked, "Are you going to give us something [money] to start on this [before we kill the victims]?" and GRZEGORCZYK agreed to give UC1 and UC2 a $3,000 deposit for the murders. GRZEGORCZYK, UC1, and UC2 agreed to meet the following Monday, May 1, 2012, so GRZEGORCZYK could give UC1 and UC2 the $3,000 deposit. UC1

---

[11] A subsequent computer records check of the Illinois Secretary of State revealed that Victim Vehicle is registered to Individual C at the residence GRZEGORCZYK pointed out to UC1 and UC2 as belonging to Individual C.

then drove GRZEGORCZYK back to the McDonald's parking lot and GRZEGORCZYK exited the UCV 2.

29.     On or about April 30, 2012, at approximately 6:30 p.m., UC1 made a consensually recorded and monitored telephone call to GRZEGORCZYK at GRZEGORCZYK Phone 2.     A review of the audio recording reveals that GRZEGORCZYK and UC1 agreed to meet on Wednesday, May 2, 2012, at the same McDonalds so GRZEGORCZYK could pay UC1 the $3,000 deposit.

30.     On or about May 2, 2012, at approximately 3:45 p.m., law enforcement set up surveillance near the McDonalds located at the intersection of Elston Street and Milwaukee Avenue, where GRZEGORCZYK agreed to meet UC1 and UC2.  Shortly thereafter, UC1, and UC2 departed to the meet location in the UCV 2.  Before arriving at the meet location, agents equipped UC1 with an audio and video recording device, as well as a audio transmitter.

31.     At approximately 4:30 p.m., law enforcement observed the UCV 2 arrive and park in the McDonalds parking lot located on Elston Street and Milwaukee Avenue.  Shortly thereafter, law enforcement observed GRZEGORCZYK arrive at the McDonalds on foot.  According to law enforcement, after GRZEGORCZYK arrived in the parking lot, he approached the UCV 2 and entered the front passenger seat.  According to UC1, when GRZEGORCZYK entered the UCV 2 he was carrying a small black duffle bag.  According to UC1, after GRZEGORCZYK entered the UCV 2, GRZEGORCZYK told UC1 that he had been dropped off at the McDonalds by someone and instructed UC1 to "drive around," which UC1 did.  According to UC1, UC1 drove to the parking lot of Red Apple Restaurant located on Milwaukee Avenue and Imlay Street.  According to UC1 and UC2, while still in the UCV 2, GRZEGORCZYK told UC1 and UC2 that he had "more information"

14

for them, and handed UC1 several photographs depicting additional individuals that GRZEGORCZYK wanted to be murdered. As GRZEGORCZYK was handing UC1 the photographs, UC1 advised that GRZEGORCZYK stated something to the effect of "no witnesses."

32. According to UC1 and UC2, during this conversation GRZEGORCZYK told UC1 and UC2 that GRZEGORCZYK wants them to kill six individuals: Individual B; Individual C (Individual B's husband); Individual D (Individual B's son); Individual E (Individual B's daughter-in-law); Individual F (Individual B's mother); and Individual G. According to UC1 and UC2, GRZEGORCZYK told UC1 and UC2 to kill Individual D in front of Individual B, and that GRZEGORCZYK prefers that the intended victims be burned alive, but that UC1 and UC2 should do it whatever way is safest so they don't get caught.

33. According to UC1 and UC2, during this conversation, GRZEGORCZYK pulled out a black brief case from inside the black duffle bag that he had with him and displayed approximately $45,000, mostly in hundred dollar bills, which were inside the black briefcase. According to UC1 and UC2, on top of the cash was a 9mm semi-automatic handgun and two magazines. According to UC1 and UC2, GRZEGORCZYK handed UC1 approximately $3,000 in cash and stated something to the effect of "$3,000 up front." According to UC1 and UC2, GRZEGORCZYK told UC1 and UC2 that the remainder of the cash in the brief case would be theirs after they completed the murders.

34. According to UC1 and UC2, during this conversation, UC1 told GRZEGORCZYK that GRZEGORCZYK better get rid of the pictures and guns GRZEGORCZYK has at his house, and GRZEGORCZYK told UC1 that GRZEGORCZYK intended on leaving for Poland on June 8,

15

2012, and stated something to the effect of "before I leave, everything except my clothes will be gone."

35.     According to UC1 and UC2, following this conversation, GRZEGORCZYK, UC1 and UC2 drove in the UCV 2 to a location across the street from the McDonalds parking lot located near Elston Street and Milwaukee Avenue. According to law enforcement, when they arrived at this location, GRZEGORCZYK was arrested and taken into custody. According to law enforcement, as part of a search incident to arrest, law enforcement seized the approximately $45,000 in cash and the firearm, which GRZEGORCZYK had in his possession.

36.     According to law enforcement, following GRZEGORCZYK's arrest, agents read GRZEGORCZYK his *Miranda* rights. According to law enforcement, after being read his *Miranda* rights, GRZEGORCZYK told law enforcement that he has lived at the **Subject Premises** for approximately the past two months and that all of his personal effects are located there, including a firearm, ammunition, and cash.

37.     According to law enforcement, following GRZEGORCZYK's arrest, law enforcement approached a vehicle parked on a nearby side street. Sitting in the drivers seat of the vehicle was a white male ("Individual H"). According to law enforcement, Individual H told law enforcement that Individual H was waiting for his uncle, ZENON GRZEGORCZYK. Individual H was subsequently interviewed by law enforcement. During the interview, Individual H stated that GRZEGORCZYK was his uncle and that GRZEGORCZYK had been living with Individual H at the **Subject Premises** for approximately the past two months.[12]     According to Individual H,

_____

[12] According to Accurint, Individual H is the owner of the **Subject Premises**.

16

GRZEGORCZYK occupies the basement room but has "stuff" all over the residence. According to Individual H, Individual H believes that GRZEGORCZYK's keeps, among other things, the following items in the **Subject Premises**: 1) a safe which contains, among other things, cash; 2) personal photographs, including photographs of several of the intended victims; 3) phone books; and 4) a computer.

38.     Based on the foregoing, agents are stationed at the **Subject Premises** in anticipation of the issuance of a warrant to search the location. Given that GRZEGORCZYK has been arrested, and Individuals H has been notified of his arrest, Your Affiant requests authority to execute the warrant at any time of the day or night. Agents intend to execute the warrant immediately upon its issuance, in order to prevent any destruction of evidence or flight by Individual H or anyone else that has access to the **Subject Premises**.

## SPECIFICS REGARDING SEARCHES OF COMPUTER SYSTEMS

39.     Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks,

17

depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

        b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

38.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

## PROCEDURES TO BE FOLLOWED IN SEARCHING COMPUTERS

39.    The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure.

Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

40.     With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.     surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

d.     opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

19

e.      scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

f.      performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

41.      Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, as dictated by the volume and complexity of the items seized, excluding any items or materials deemed to be contraband, or unless otherwise ordered by the Court.

## CONCLUSION

42.      Based upon the information set forth herein, there is probable cause to believe that ZENON GRZEGORCZYK used a facility of interstate commerce with intent that a murder be committed in violation of the laws of the State of Illinois (720 ILCS 5/9-1), in violation of Title 18, United States Code, Section 1958(a).

43.      Based on the above information, there is probable cause to believe that evidence, instrumentalities, and contraband relating to GRZEGORCZYK's violation of Title 18, United States Code, Section 1958, as further described in Attachment B, will be found in the **Subject Premises**, as further described in Attachments A.

20

44.    Accordingly, it is requested that a Search Warrant be issued for the **Subject Premises** more particularly described in Attachment A, authorizing the seizure of items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.


        FURTHER AFFIANT SAYETH NOT.


        _____
        ERIC DORNBUSCH
        Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives


SUBSCRIBED AND SWORN to before me on May 3, 2012.

        _____
        JEFFREY T. GILBERT
        United States Magistrate Judge